IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANGELA MILLER,                          :
                                        :
                    Plaintiff,          :    CIVIL ACTION
                                        :
        v.                              :    NO. 11-cv-0023
                                        :
THOMAS JEFFERSON UNIVERSITY             :
HOSPITAL, RICHARD GOSSAR, CAROL         :
STAFFIERI, MARIAN FEIL, and THOMAS      :
JEFFERSON UNIVERSITY

                    Defendants.


**MEMORANDUM & ORDER**

**Joyner, C. J.**                          **November 15, 2012**

        Before this Court are Defendants' Motions for Summary
Judgment (Doc. Nos. 22, 23 and 24), Plaintiff's Response thereto
(Doc. No. 27), and Defendants' Reply in further support thereof
(Doc. No. 30).  For the reasons set forth below, the Court grants
the Defendants' Motions.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

        Angela Miller ("Miller" or "Plaintiff"), an African-American
woman, is the alleged victim of discrimination while she was a
student in the nurse anesthetist program at Thomas Jefferson
University ("Jefferson University," "the University," or
"Defendant").  The nurse anesthetist program requires clinical
rotations, where the students learn alongside a certified
registered nurse anesthetist ("CRNA") with real patients.

Students are assigned to different hospitals for their clinical rotations, and each hospital has a clinical coordinator who is also a CRNA.  At the hospital, each student would be assigned to a different room with a different CRNA, working with a number of different CRNAs over time.  The CRNA would submit an evaluation of the student's work that day.  Additionally, the clinical coordinators would submit summative evaluations to the University periodically, tracking the student's progression over time and ultimately determining, at least in part, whether the student passed the semester.

Miller was assigned to Methodist Hospital ("Methodist") for her clinical rotations, beginning in April 2006.  The clinical coordinator at Methodist was Richard Gossar.  There were two other students assigned to Methodist, Judith Harvey, who is African-American, and Gabrielle Donofry, who is white.  At first, Miller's relationship with Gossar was good.  But in the second semester at Methodist, the students began having problems with Gossar.  They believed he was overly demanding, had unrealistic expectations, and was difficult to deal with.  While speaking with Harvey and Miller, Gossar would refer to them as "you people" and speak to them in a condescending manner.  He would also yell at them.  At one point, another CRNA at Methodist was quizzing Harvey during a procedure.  When she asked if she could answer the questions after the procedure, the CRNA said, "no, a

monkey could do this.  What are you a monkey?"

The students arranged a meeting with the program director Michael Booth and assistant program director Julia Feliciano to discuss the issues.  At this meeting, nobody mentioned racial issues or discrimination at Methodist.  Booth and Feliciano met with Gossar to discuss the issue.  Meanwhile, Booth and Feliciano determined that the students were not getting a sufficient variety of cases at Methodist and decided that they would rotate Methodist students to other sites.

After the second semester at Methodist, all of the students went to other hospitals.  Miller was transferred to Jefferson Hospital ("Jefferson" or "Jefferson Hospital").  She successfully completed the Fall 2006 semester at Jefferson, and returned to Methodist for the Spring 2007 semester.

Back at Methodist, Gossar remained the clinical coordinator. Gossar continued his previous treatment of Miller, and Miller again spoke with program director Booth.  Booth and Feliciano met with the chief of the department at Methodist, and decided that Gossar should be removed as clinical coordinator.  Carol Staffieri was chosen to replace Gossar.  After Gossar was removed, Miller continued to have issues with the CRNAs at Methodist.  On April 4, 2007, Miller left early after a miscommunication with a CRNA who had not meant for her to go home after cleaning up a room.  On April 17, 2007, an operation was to

be performed on a patient's right arm.  Miller took the patient's blood pressure and left the room, leaving the cuff on the patient's left arm.  As a result of the blood pressure cuff on the patient's left arm, the operation was performed on the wrong arm.

On April 20, 2007, Miller called Feliciano and left a message on her voicemail complaining of racism at Methodist. Feliciano emailed Miller saying she would like a meeting to follow up.  Feliciano also suggested that Miller should contact student services at the University to speak to them about the racial issues and make a complaint of discrimination.  Miller spoke with student services, but decided not to file a formal complaint after hearing that it would be a long process of investigation.  Feliciano met with Staffieri to discuss Miller's complaint and ask her if she witnessed any discrimination.  After this, Miller says she overheard a meeting with the CRNAs and other staff at Methodist where Staffieri told them of her discrimination complaint and told them to "watch out" for Miller and not discriminate against her.  Miller says that the CRNAs at Methodist stopped speaking to her.

On May 28, 2007, a meeting was held to discuss Miller's performance in the nurse anesthetist program.  A meeting had not yet occurred to discuss Miller's discrimination charge.  At this meeting, Miller was told that her evaluations at Methodist were

not on track with those of her classmates. She was given a plan for improvement and placed on probation until August 2007. Despite the probation, Miller still passed the Spring 2007 semester. After this meeting, Miller was transferred away from Methodist and back to Jefferson. Before returning to Jefferson, Miller spent a month at Our Lady of Lourdes Hospital, where she received excellent reviews. Miller asked Feliciano if she could remain at Lourdes for another rotation instead of going to Jefferson, but Feliciano told her she needed to go to Jefferson.

Back at Jefferson, the clinical coordinator was Marian Feil. Feil and Miller clashed almost immediately. Miller believed that Feil was treating her harshly, suspecting that Feil had heard of Miller's complaint of discrimination at Methodist. During a discussion about Miller's scheduling issues, Feil said to Miller that she had "heard what had happened at Methodist" and Miller was not going to "get over" like she did there. Feil thought Miller was trying to manipulate the schedule. Feil referred to Miller as "you people" on at least one occasion, saying that she should consider something other than anesthesia. At one point, Feil yelled at Miller for arriving early to set up for an operation, believing that Miller was trying to manipulate the schedule by arriving early so she could leave early. Nevertheless, Miller received satisfactory ratings from Feil in her summative evaluation at the end of the semester, except in

categories relating to attendance.  Feliciano ended Miller's probation, and Miller passed the Summer 2007 semester.

Miller continued to have issues during the Fall 2007 semester at Jefferson.  On October 4, 2007, Miller was working with CRNA Katherine Celebre.  Miller was not performing the procedure properly and was unprepared, so Celebre completed the procedure.  On October 8, 2007, Miller was working with a doctor for a spinal procedure.  After Miller prematurely removed a needle, the procedure needed to be done again.  Miller was criticized for this and for breaking sterility during the procedure.  Miller received detailed negative evaluations for these incidents.  After the University heard of these two incidents, Miller was counseled that she was in jeopardy of being dismissed from the program.  Miller was informed that she needed to comply with a number of conditions to successfully complete the semester, including not receiving any unsatisfactory or requires improvement marks.

Miller received a number of mid-semester evaluations that were critical of her performance.  These evaluations came from Feil, Celebre and Debra O'Connor.  The CRNAs believed that Miller was not at the point she should be at that stage in her education, and worried that she could not function independently as a CRNA.  After this, in November 2007, Miller went to Deborah Heart and Lung Hospital for a rotation.  Miller received positive

evaluations at Deborah, but her weekly evaluations and care plans were delayed in getting to Jefferson.

After returning to Jefferson in December, she received notification informing her that she remained in jeopardy of failing the program. The notification reiterated objectives that Miller needed to satisfy to remain in the program. In December, a number of CRNAs evaluated Miller's performance negatively, observing that her performance was unsatisfactory and unsafe. These CRNAs included Lisa Loonstyn Gormley, who recounted several incidents of unsafe and subpar work, and Eileen Dirvin, who rated Miller as unsatisfactory in eight categories. As a result, Feliciano informed Miller that she would receive a failing grade, and be dismissed from the program.

On January 8, 2008, the Associate Dean for Graduate Programs sent Miller a letter recommending her dismissal. The Promotion and Progression Committee reviewed and approved the recommendation that Miller be dismissed due to her inadequate clinical performance. Feliciano then denied Miller's grade appeal, and advised her of her right to appeal the decision in accordance with the student handbook. Miller appealed to the Dean of the School of Nursing, Dr. Schaal. After independently reviewing Miller's file, Dr. Schaal denied Miller's appeal on February 11, 2008, advising her that she found that she had failed to demonstrate progress in meeting course objectives or

meet the guidelines set forth by faculty.  On February 28, 2008,
Miller appealed the Dean's decision to the Grade Appeals Board at
the University, which consisted of five individuals who were not
connected to the nurse anesthetist program.  The Board heard
testimony from witnesses offered by Miller and the University and
considered documentation in Miller's file, including clinical
evaluations.  The Board voted unanimously to deny Miller's appeal
and sent her a letter explaining its decision, noting that
Feliciano had properly considered a broad range of evaluations.
Miller then appealed the Board's decision to the Dean of
Jefferson College of Health Professionals, Dr. Erdmann, who met
with Miller, considered her appeal and the documents supporting
it and issued a decision denying her appeal.

Separate from the appeal process, the Dean of Student
Affairs conducted an investigation into Miller's charge of racial
discrimination.  The Dean interviewed people from Methodist and
Jefferson Hospitals, ultimately concluding that there was no
evidence of harassment, discrimination, or bias.  Rather, he
judged the staff behavior as related to Miller's performance
issues.  Miller had the opportunity to meet with the Dean of
Student Affairs to discuss his findings, which she declined to
do.

Miller then filed a complaint of discrimination with the
U.S. Department of Education Office of Civil Rights.  The

Department investigated Miller's complaint of a racially hostile work environment and discrimination. On June 4, 2009, the Department issued a decision denying Miller's complaint.

The Plaintiff filed this action in January 2011 against Thomas Jefferson University Hospital, Gossar, Feil and Staffieri. She then filed an Amended Complaint adding Thomas Jefferson University. The parties stipulated in November to dismissing Jefferson Hospital and Gossar as parties. The Amended Complaint includes five counts. Counts I, II and III claim violations of 42 U.S.C. § 1981 ("Section 1981") for racial discrimination, retaliation, and harassment. Count IV alleges a breach of contract claim. Count V asserts a common law claim for unjust enrichment. After the parties conducted discovery, the Defendants filed three separate Motions for Summary Judgment, one on behalf of the University, one on behalf of Feil, and one on behalf of Staffieri.[1]

## II.  STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[1] The Defendant has also filed a Motion to Strike Plaintiff's Expert Report and Testimony (Doc. No. 29). The Court has considered the report, the Motion to Strike, and the response and reply thereto, and would have reached the same conclusion with regard to the Motions for Summary Judgment with or without the expert report. The report does contain some inadmissible portions, but is not amenable to be struck in its entirety. Given that the result would not change even if the Court were to consider the report in its entirety, the Court need not address this issue further and has denied the motion as moot by separate order.

An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party; a factual dispute is material only if it might affect the outcome of the suit under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In conducting our review, we view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 535 (3d Cir. 2007); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the non-moving party cannot rely on "bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005). When the non-moving party is the plaintiff, she must "make a showing sufficient to establish the existence of [every] element essential to [her] case and on which [she] will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### III. DISCUSSION

#### A. Plaintiff's Claims against Feil and Staffieri

Defendants Feil and Staffieri have moved for summary judgment separately from the University. They both argue that there is no evidence that they acted in a discriminatory,

retaliatory, or harassing manner, and as hospital employees, they cannot be liable for a dismissal decision made by the University.[2]

The Third Circuit has held that there can be individual liability under Section 1981.  See Al-Khazraji v. Saint Francis Coll., 784 F.2d 505, 518 (3d Cir. 1986).  Specifically, "employees of a corporation may become personally liable when they intentionally cause an infringement of rights protected by Section 1981, regardless of whether the corporation may also be held liable."  Liability for individuals under Section 1981, therefore, contemplates intentional discrimination by a individual defendant.

The Plaintiff has presented no evidence of intentional discrimination by either Feil or Staffieri.  Furthermore, the decision to dismiss her from the program was made by University officials, not Feil or Staffieri.  Therefore, the claim for discrimination under Section 1981 against Feil and Staffieri cannot stand.

Nor can the claims of retaliation against Feil and Staffieri move forward.  The Plaintiff has presented some evidence of

_____

[2] The claims for breach of contract and unjust enrichment in Counts IV and V of the Amended Complaint are against the University only.  (Am. Compl., at 10-11, Doc. No. 3).  Therefore, the only claims against Feil and Staffieri are those for discrimination, retaliation, and harassment under Section 1981.

Feil's knowledge of the disciplinary complaint[3] and Feil's unpleasant attitude towards and criticism of her. However, the Plaintiff has not shown intentional retaliation. For a retaliation claim, a plaintiff must show: (1) she engaged in a protected activity; (2) there was adverse action after or contemporaneous with the protected activity; and (3) a causal link exists between the adverse action and the protected activity. <u>Andreoli v. Gates</u>, 482 F.3d 641, 649 (3d Cir. 2007). Feil's evaluations of the Plaintiff and her occasional clashes with the Plaintiff do not constitute adverse action. While Feil did criticize the Plaintiff, Feil rated her as satisfactory in all categories, except those related to attendance, in her summative evaluation of the Plaintiff at the end of the Summer 2007 semester. (Ex. MF-108 to Ex. C to Def.'s Mot. for Summ. J., Doc. No. 22). And even if Feil's evaluations could be deemed adverse action, the Plaintiff has not presented evidence, or even claimed, that Feil made these evaluations with the intent to retaliate against her. Nor can the Plaintiff's dismissal from the program be the basis for the retaliation claim against Feil, because Feil was not responsible for that decision.[4] Therefore,

---

[3] While there may be a genuine issue as to whether Feil knew of the complaint, that issue is not material because the Plaintiff fails to make a prima facie case of intentional retaliation by Feil.

[4] There was also no causal link between the complaint and the Plaintiff's dismissal from the University, as discussed in further detail in Section III.B.2 of this Memorandum.

the Plaintiff simply has not put forward evidence to support an intentional retaliation claim against Feil.

Although Feliciano shared the information of Plaintiff's complaint with Staffieri (Ex. D to Def.'s Mot. for Summ. J., at 109, Doc. No. 22), the Plaintiff has introduced no evidence of intentional adverse action that Staffieri took after the protected activity. In fact, the Plaintiff states that Staffieri never discriminated against or harassed her. (Ex. B to Def.'s Mot. for Summ. J., at 107:19-108:1, Doc. No. 22). Therefore, the Plaintiff has failed to make a case of retaliation against Feil or Staffieri as individual defendants.

Finally, the Plaintiff has failed to support her claim of a hostile work environment under Section 1981 with respect to Feil and Staffieri. Plaintiff admitted that Staffieri never engaged in any harassment of her. (Ex. B to Def.'s Mot. for Summ. J., at 107:19-21, Doc. No. 22). The Plaintiff puts forth evidence of a number of unpleasant incidents with Feil. For example, Feil told her she should not stay in the program, and could do better as a nurse practitioner, Feil denied her requests for schedule changes, and Feil yelled at her for arriving early to a procedure. (Id. at 118:4-21, 123:1-7, 123:19-125:2). However, the Plaintiff admits that Feil never used racially oriented language towards her. (Id. at 121:2-4). Even considering all allegations about the unpleasant interactions the Plaintiff had

with Feil, the Plaintiff's claim for harassment, or hostile work environment, under Section 1981 cannot stand.  For a hostile work environment claim, "[t]he discriminatory conduct must be so extreme as to amount to a change in the terms and conditions of employment.  Unless they are extremely severe, off-hand comments and isolated incidents are insufficient to sustain a hostile work environment claim."  Woodard v. PHB Die Casting, 255 F. App'x 608, 609 (3d Cir. 2007).  The conduct the Plaintiff has shown simply does not amount to the "severe and pervasive" harassment envisioned by Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).  The Plaintiff has failed to show issues of fact that would preclude summary judgment with regard to the hostile work environment claims against Feil and Staffieri.

Therefore, the Court grants Defendant Feil's and Defendant Staffieri's Motions for Summary Judgment.

## B.  Plaintiff's Claims Against the University

### 1.  Plaintiff's § 1981 Discrimination Claim

The Plaintiff claims in Count I that she was dismissed from the program at the University due to her race, in violation of 42 U.S.C. § 1981.  Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts...as is enjoyed by white citizens..."  42 U.S.C. § 1981.  Section 1981 applies to the Plaintiff's claims because the relationship

between university and student is contractual in nature.  See Reardon v. Allegheny Coll., 926 A.2d 47, 480 (Pa. Super. Ct. 2007).

The Third Circuit applies the McDonnell Douglas burden shifting framework to Section 1981 claims.  See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).  The Plaintiff must first establish a prima facie case of discrimination by showing: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse action despite being qualified; and (4) she was dismissed under circumstances that raise an inference of discrimination.  Sarullo v. U.S. Postal Service, 352 F.3d 789, 797 (3d Cir. 2009).  After the plaintiff has made this prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) ("The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.").  If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  A plaintiff can demonstrate pretext by providing evidence that would lead a factfinder to

either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  <u>Jones</u>, 198 F.3d at 413.

The Defendant contends that the Plaintiff has not met her burden in establishing a prima facie case because she is not qualified and cannot show circumstances that raise an inference of discrimination.  (Mem. of Law in Supp. of Mot. for Summ. J. of Def. Thomas Jefferson Univ., at 23-24, Doc. No. 22).  The Court finds that even assuming that the Plaintiff has established a prima facie case for discrimination, the Defendants have offered a legitimate, nondiscriminatory reason for her dismissal from the program and the Plaintiff has failed to present sufficient evidence of pretext.

Even drawing all reasonable inferences in the Plaintiff's favor, the Plaintiff has not put forth enough evidence to allow a reasonable factfinder to find that the Defendant's reasons for dismissing the Plaintiff were pretext for race discrimination. The Defendant states that the Plaintiff's unsafe clinical practices and failure to sufficiently advance in her performance are the reason for the Plaintiff's failing grade and dismissal. (Mem. of Law in Supp. of Mot. for Summ. J. of Def. Thomas Jefferson Univ., at 25-26, Doc. No. 22).  The University has also put forward ample evidence to support this reason, in the form of

evaluations and depositions from numerous actors and evaluators at Methodist and Jefferson Hospitals.

The Plaintiff has submitted evidence regarding only three arguably racial remarks, one of which was not directed at her. The Plaintiff stated in her deposition that Gossar and Feil both referred to the Plaintiff as "you people" on at least one occasion. (Ex. J to Pl.'s Resp. to Def.'s Mot. for Summ. J., at 76:6-14, 118:7-11, Doc. No. 27). The Plaintiff has also submitted evidence that on one occasion, a CRNA said to Judith Harvey, another African American student, "a monkey could do this. What are you a monkey?" (Ex. J to Pl.'s Resp. to Def.'s Mot. for Summ. J., at 44:8-9, Doc. No. 27). In Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (3d Cir. 2010), the Third Circuit opined that the use of the phrase "you people" was not alone "so revealing of discriminatory animus that it would enable a factfinder to conclude that a discriminatory attitude was, more likely than not, a motivating factor in the decision..." Id. at 269. Furthermore, the decisionmakers at Jefferson (Feliciano, Schaal, the Grade Appeals Board, and Erdmann) never used this phrase.

In light of the Defendant's powerful and substantiated nondiscriminatory reasons for dismissing the Plaintiff from the program, the Plaintiff simply has not fulfilled her burden to demonstrate that the reason was pretext for discrimination. A

17

plaintiff can show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (emphasis in original).  To do so, the plaintiff cannot rely merely on "conclusory allegations or suspicions to show the existence of a genuine issue." Podobnik, 409 F.3d at 594.  The Plaintiff's discrimination claim is built upon her suspicions that a multitude of hospital employees at Methodist and Jefferson were all biased against her because of her race and her charge of discrimination, and that they accordingly gave her the low evaluations that led to her dismissal.  These allegations, even combined with the few arguable instances of racial hostility described above, are not enough to allow a reasonable factfinder to find the University's stated reason to be "unworthy of credence."  Accordingly, the Court grants summary judgment for the Defendant on the Plaintiff's discrimination claim under Section 1981.

### 2.  Plaintiff's § 1981 Retaliation Claim

The Plaintiff claims in Count II that she was retaliated against in violation of Section 1981 after she complained of discrimination at Methodist.  She states that she was ostracized by employees at Jefferson Hospital, received negative

evaluations, and was ultimately dismissed from the program in retaliation. (Am. Compl., ¶ 52, Doc. No. 3). The Supreme Court has held that Section 1981 encompasses retaliation claims. CBOCS W., Inc. v. Humphries, 553 U.S. 442, 457 (2008). To present a claim of retaliation, a plaintiff must show: (1) she engaged in a protected activity; (2) the employer (here, the University) took an adverse action after or contemporaneous with the protected activity; and (3) "a 'causal link' exists between the adverse action and the protected activity." Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007). Regarding the Plaintiff's dismissal from the University program, the parties seem to agree that the first two elements of the prima facie case, protected activity and adverse action, have been fulfilled. Therefore, the Court will turn to the third element, the causal link.

For a causal link, the Third Circuit has found two main factors relevant "in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism." Abramson v. William Patterson Coll. of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001). Timing must be "'unusually suggestive' of retaliatory motive before a casual link will be inferred." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997). For example, in Krouse, the Third Circuit found that nineteen months was too attenuated to create a genuine issue of material fact and upheld a grant of summary judgment. Id. Although

timing and ongoing antagonism are often the decisive factors, a
plaintiff may "substantiate a causal connection for purposes of
the prima facie case through other types of circumstantial
evidence that support the inference [of retaliation]." Farrell
v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000).
Such other evidence includes inconsistent explanations. Id. at
281.

The Plaintiff has failed to establish a causal link between
her protected activity and her dismissal from the CRNA program at
Jefferson University. The Plaintiff complained of discrimination
on April 20, 2007, and was formally dismissed from the program on
January 8, 2008. (Ex. D to Def.'s Mot. For Summ. J., at 106:2-
11, Doc. No. 22; Ex. P to Pl.'s Resp. to Def.'s Mot. for Summ.
J., Doc. No. 27; Ex. 1 to Ex. D to Def.'s Mot. for Summ. J., at
106:2-11, Doc. No. 22). Therefore, almost nine months passed
after the Plaintiff's protected activity before she was
dismissed. Such timing is not so "unusually suggestive" such
that it will create an inference of retaliation. Furthermore,
the Plaintiff passed two semesters (Spring and Summer of 2007)
between the time she made the complaint and when she was
dismissed for failing the Fall 2007 semester.

The Plaintiff has not introduced sufficient evidence of
ongoing antagonism, or other circumstantial evidence, to support
an inference of retaliation. The Plaintiff asserts that the

CRNAs with whom she worked and who evaluated her negatively during that time knew of her complaint, and gave her poor evaluations because of it. (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 33, Doc. No. 27). However, the Plaintiff has only submitted circumstantial evidence that one of these CRNAs may have known of her complaint. In her deposition, the Plaintiff states that Feil said she "knew what had happened at Methodist;" however, the context of this discussion was the Plaintiff's scheduling requests, not her charge of discrimination. (Ex. J to Pl.'s Resp. to Def.'s Mot. for Summ. J., at 123:4-7, Doc. No. 27). Feil states that she did not know of the Plaintiff's charge of discrimination until after the Plaintiff was dismissed. (Ex. C to Def.'s Mot. For Summ. J., at 151:9-17, Doc. No. 22). Even crediting the Plaintiff's evidence that Feil knew of her complaint, she has not submitted evidence that any of the other CRNAs who gave her negative evaluations knew of her complaint of discrimination at Methodist. To support her claim that the CRNAs working at Jefferson knew of her complaint, the Plaintiff merely speculates that the staff at the two hospitals were friendly and had worked at both hospitals at times.[5] (Pl.'s Resp. to Def.'s

---

[5] The Plaintiff has submitted evidence that the CRNAs at Methodist knew of her charge of discrimination, testifying at her deposition that she overheard a meeting between Staffieri and the staff at Methodist about her complaint. However, this evidence does not aid in creating a genuine issue of material fact as to whether the staff at Jefferson, whose negative evaluations ultimately contributed to the Plaintiff's dismissal from the University, knew of her complaint.

Mot. for Summ. J., at 33, Doc. No. 27). This is the sort of
"bare assertion[], conclusory allegation[], or suspicion[]" that
will not suffice to defeat a motion for summary judgment.
Podobnik, 409 F.3d at 594. Furthermore, the Defendant has
submitted evidence to the contrary. (Ex. D to Def.'s Reply, at
20:19-23, Doc. No. 30; Ex. E to Def.'s Reply, at 10:2-9, Doc. No.
30). Therefore, the Plaintiff has not shown evidence of ongoing
antagonism, or other circumstantial evidence, sufficient for a
causal link to support her claim of retaliation.

With regard to the Plaintiff's claims that she was
retaliated against in the form of ostracism by employees at
Jefferson Hospital and negative evaluations, the Plaintiff has
failed to make a prima facie case on these claims. The Plaintiff
admits to the circumstances that led to the negative evaluations,
for example, the incidents on October 4th and 8th of 2007.
Therefore, the claim of retaliation by negative evaluations
relies upon the Plaintiff's suspicions that CRNAs were biased
against her, even though there is no evidence that they even knew
of her discrimination charge. Similarly, the ostracism or
"silent treatment" that the Plaintiff claims also relies on these
unsubstantiated suspicions. Even if these were adverse actions,
the Plaintiff would fail to make out a prima facie case because
there is no causal link to connect the Plaintiff's charge of
discrimination and the ostracism and negative reviews, as there

is no evidence the CRNAs even knew of her charge of discrimination.  Therefore, the Court grants summary judgment for the Defendant on all of the Plaintiff's retaliation claims under Section 1981.

### 3.  Plaintiff's § 1981 Hostile Work Environment Claim

The Plaintiff claims in Count III of the Amended Complaint that the University subjected her to a hostile work environment because of her race, in violation of Section 1981.  A hostile work environment claim under Section 1981 is analyzed in the same manner as under Title VII.  To succeed on a hostile work environment claim, a plaintiff must prove: (1) she suffered intentional discrimination on the basis of race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and (5) there is a basis for employer liability, such as *respondeat superior*.  Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999).

In determining whether an environment is sufficiently hostile or abusive to support a claim of discrimination, the Court examines the totality of the circumstances and factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with

an employee's work performance." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998). Simple teasing, offhand remarks and isolated incidents are not enough; rather, the conduct must be sufficiently extreme that it amounts to a change in the terms and conditions of employment. <u>Id.</u> at 788. These standards serve to ensure that Title VII, and by extension Section 1981, "does not become a 'general civility code.'" <u>Id.</u> (quoting <u>Onacle v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 80 (1998)).

"The basis for an employer's liability for hostile environment [racial] harassment depends on whether the harasser is the victim's supervisor or merely a coworker." <u>Huston v. Procter & Gamble Paper Prod. Corp.</u>, 568 F.3d 100, 104 (3d Cir. 2009). When a harasser is a co-worker or other non-supervisor, employer liability attaches "only if the employer failed to provide a reasonable avenue for complaint, or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." <u>Id.</u> "An employer's remedial action is adequate if it is reasonably calculated to prevent further harassment." <u>Id.</u> at 110. Courts distinguish "employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers." <u>Griffin v. Harrisburg Prop. Servs.</u>, 421 F. App'x 204, 208 (3d Cir. 2011).

In this case, the two people who the Plaintiff alleges

harassed her were both equivalent to co-workers, rather than supervisors. Although they may have been overseeing the Plaintiff's actions in the operating room as she practiced as a student, these CRNAs were employees of the hospitals for whom they worked, not the University where the Plaintiff was a student. The Plaintiff's ultimate supervisors were the teachers and program directors with the CRNA program at the University. These individuals, like Feliciano, ultimately had supervisory powers over the Plaintiff, and were empowered to discipline, grade, and dismiss her. Therefore, as the alleged harassment was not performed by a supervisor, the University can only be liable if there was no "reasonable avenue for complaint" or the University "knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Huston, 568 F.3d at 104.

With regard to the alleged harassment by Gossar, there is no basis for holding the University liable. First of all, the University had a formal complaint procedure that was available and known to the Plaintiff. (Ex. B to Def.'s Mot. for Summ. J., at 389:13-390:7, Doc. No. 22). Second, the Plaintiff did complain of Gossar's behavior towards her and other students several times, but it was not until she made her verbal complaint to Feliciano on April 20, 2007 that she mentioned racial harassment. (Id. at 55:20-56:10; 389:5-18). After the

University was on notice of this racial harassment at Methodist and due to her deteriorating clinical performance, the Plaintiff was removed from Methodist and reassigned to Jefferson.  (Ex. 48 to id.).  Removing the Plaintiff from the hospital where her alleged harasser worked is appropriate remedial action, because it is "reasonably calculated to prevent further harassment." Huston, 568 F.3d at 110.  Therefore, even if Gossar's behavior towards the Plaintiff can be deemed sufficiently severe and pervasive for a hostile work environment, there is no basis for holding the University liable.

With regard to the alleged harassment by Feil, the Plaintiff never made any complaint, formal or informal, of racial harassment by Feil to any University supervisor.  While it appears that the Plaintiff may have clashed with Feil over a number of issues, particularly scheduling, the Plaintiff simply never brought any alleged harassment due to her race to the University's attention.  The Plaintiff knew of the procedure for making complaints.  The University did not know, nor should it have known, of any alleged harassment of the Plaintiff by Feil while the Plaintiff was at Jefferson.  Therefore, even if the harassment by Feil can be deemed sufficiently severe and pervasive, there is no basis for holding the University liable.[6]

---

[6] Furthermore, the instances of harassment that the Plaintiff describes cannot be deemed sufficiently severe and pervasive for a hostile work environment claim.  At most, the Plaintiff describes a few "offhand comments" and "isolated incidents" where her race might have been involved.  See

Accordingly, the Court grants summary judgment for the Defendant
on the Plaintiff's hostile work environment claim.

### 4. Plaintiff's Breach of Contract Claim

In Count VI of the Amended Complaint, the Plaintiff claims
that the Defendant breached the terms of a contract between the
University and the Plaintiff by failing to follow the terms of
the appeals process established by the University handbook. (Am.
Compl., at ¶ 59, Doc. No. 3). However, the Plaintiff does not
argue this theory for a breach of contract in her response to the
Defendant's Motion for Summary Judgment; rather, she claims that
the Defendant breached a contract with the Plaintiff by failing
to provide her with the education that was promised in the
handbook and given to her peers. (Pl.'s Resp. to Def.'s Mot. for
Summ. J., at 49, Doc. No. 27). On either theory, the Court must
grant summary judgment in favor of the Defendants.

With regard to the claim that the Defendant breached a
contract with the Plaintiff by failing to follow the terms of the
appeals process, the Plaintiff has not shown that any damages
resulted from this alleged breach. A private university's
student handbook is viewed as a contractual agreement between the

---

Faragher, 524 U.S. at 778. The Plaintiff also describes a work environment
where she was yelled at or chastised for mistakes, and given the silent
treatment by other hospital employees. The Plaintiff admits to a number of
the mistakes for which she was chastised, and in a hospital environment, where
peoples' lives are at stake, an occasional inappropriate reaction to a
student's mistake is highly understandable. While it might not make for the
ideal learning environment, it simply cannot be termed a discriminatory
environment that is severe or pervasive.

university and the student. <u>Reardon</u>, 926 A.2d at 480. For a breach of contract claim, a plaintiff must show: (1) the existence of a contract; (2) breach of duty under that contract; and (3) resulting damages. <u>Lackner v. Glosser</u>, 892 A.3d 21, 30 (Pa. Super. Ct. 2006). The Plaintiff has not shown that she suffered any harm as a result of the University's failure to precisely follow the time frames for appeals suggested in the handbook. In her deposition, she admitted that she wanted the University to take its time with her appeal, and that the University's taking its time did not cause her any harm, only delaying her a bit longer in speaking to an attorney about her options going forward. (Ex. B to Def.'s Mot. for Summ. J., at 195-198, Doc. No. 22). As the Plaintiff has failed to show damages resulting from the alleged breach of contract, she has not put forward a prima facie case for breach of contract.

With regard to the claim that the University failed to provide her with the education promised in the handbook or given to her peers, the Plaintiff has not submitted sufficient evidence to sustain a breach of contract claim here either. In Pennsylvania, there is a cause of action for breach of contract in some limited instances where "a private trade school has made a positive representation that a certain curriculum will be offered and the student then finds that such curriculum is not available." <u>Cavaliere v. Duff's Bus. Inst.</u>, 605 A.2d 397, 404

(Pa. Super. Ct. 1992). In these limited cases, "the nature of the contractual undertaking and the breach thereof are clear and the plaintiff may be able to establish a cause of action against the offending institution." Id. However, to prevail on such a claim, a plaintiff must point to specific undertakings in the handbook that were not provided. Id. Here, the Plaintiff claims that her education was lacking because Methodist did not have the variety of cases necessary for a well-rounded education. However, the Plaintiff has not elaborated on the skills that she did not develop due to Methodist's failures. Moreover, the Plaintiff was rotated out to several other hospitals, including Jefferson, Lourdes and Deborah, to supplement her education. Therefore, like in Cavaliere, the Plaintiff's claims simply "invite[] the court to enter into precisely the kind of generalized review of the entire course of instruction that so many other courts have wisely refrained from doing." Id.

As such, the Plaintiff has failed to support her breach of contract claim under either theory. The Court grants the Defendants' Motion for Summary Judgment on the breach of contract claim.

## 5. Plaintiff's Unjust Enrichment Claim

In Count V, the Plaintiff claims that the Defendant was unjustly enriched by retaining the Plaintiff's tuition and failing to provide her with an education and degree. An unjust

enrichment claim will not lie where there is a valid contract between the parties.  Halstead v. Motorcycle Safety Found., Inc., 71 F. Supp. 2d 455, 459 (E.D. Pa. 1999) ("[T]he finding of a valid contract prevents a party from recovering for unjust enrichment as the measure of damages is limited to that which is provided for in the contract itself.").  Because the relationship between a student and university is governed by a contract in the form of the student handbook, Reardon, 926 A.2d at 480, the Plaintiff cannot recover under the theory of unjust enrichment. Therefore, the Court grants the Defendant's Motion for Summary Judgment on the unjust enrichment claim in Count V.

## IV.  CONCLUSION

_____For the foregoing reasons, the Court grants the Defendant's Motion for Summary Judgment in full.  A separate order follows.